Good morning, and may it please the Court, Your Honors. I'm Clay Snell, and I'm here on behalf of the appellants Raul Galaz and Segundo Sueños, LLC. I'd like to emphasize four main points today as to why the District Court's judgment of approximately $600,000 in damages should be reversed. First of all, the District Court and Bankruptcy Court erred in awarding Mr. Julian Jackson a 50 percent interest in the music catalog because his claims were dismissed for lack of jurisdiction and his interest in Artist Rights Foundation had been properly terminated for his non-contribution for expenses. The District Court and Bankruptcy Court erred in finding that collateral estoppel precluded the appellants from arguing the law. The issues were not identical. The District Court and Bankruptcy Court erred in finding fraudulent intent under the Texas Uniform Fraudulent Transfer Act because there was no evidence to show any motive on the part of the appellants to engage in fraud. And finally, on the issue of damages, the District Court awarded damages based on an improper measure of damages and when there was no evidence of a proper measure of damages. I realize that the Court is familiar with the background facts, but if I may take just a moment to highlight a few facts of this case that I think certainly bear repeating. Of course, this case has been going on. Mrs. Galaz, Mrs. Katona has been pursuing Segundo Sueños and Raul Galaz since 2008. We're in the ninth year of litigation. As a result of this, my clients were found to have committed fraud, really when there was no evidence whatsoever of any motive on their part to commit any fraud. This case goes all the way back to 1998 when the music rights were first acquired. Fast forward to 2004 when after six years these music rights had not generated any income whatsoever. Raul Galaz was in terrible financial condition and was owing taxes to the California Board of Franchise Taxes. He attempted to have the other member of the company contribute to the outstanding expenses and he sent a request exactly as required by the operating agreement and there was no response. He tried to sell the asset to Bug Music, who had been administering the music rights for six years and they declined even to make an offer to purchase these music rights. He then turned to the only person he could think of was his father, who instead of getting a loan from decided to transfer these interests to him in exchange for a promise to take care of the outstanding franchise taxes and to eventually pay any expenses incurred by ARF. Now, it wasn't until 15 months after the transfer to Segundo that these royalties generated any money at all. And at the beginning it was only approximately $20,000 from Bug Music who just six months before had said we don't have any earnings history and we're not even willing to offer you anything. It wasn't until 15 months after the transfer that a verdict came down in a copyright infringement case involving the Ohio Players Music when Segundo realized that somebody else was pursuing interests that Segundo owned two-sevenths of. And it wasn't that verdict didn't even come out until 2006. And at that point when they went after the people who had obtained the verdict is when they actually received any kind of money. But that was two years after the transfer. And why was that? Why was it not profitable and then all of a sudden it was profitable? It just it was a stroke of luck that somebody else had pursued some of the other interest holders of the music catalog had pursued a copyright infringement case and there was zero evidence at all that either Raul Galaz or Alfred Galaz or Segundo Sueños had any indication whatsoever that these would eventually be paying out. Wasn't it the same old music? Wasn't it? Yes, Your Honor. It was the same music catalog but they had no expectation that they would pay out. Remember, Bug Music, who had administered those rights for six years and had never been able to collect a penny on them, wouldn't even offer anything to buy them. And they're in that business. That's what they do. They enforce royalty interests and go collect and they wouldn't even offer any money on that. So then Ms. Katona drags him into the bankruptcy court. Well, so help us with what the record shows year to year after the time of the transfer approximately each year after that how much royalties were. It doesn't have to be exact but give us a ballpark. Well, the first monies didn't come in and I believe it was about six months and that was only $20,000 from Bug Music. About 15 months after the transfer is after this verdict in the copyright case, I believe it was about $350,000. Now much later, I don't know exactly how it came in but at the time of trial in 2010, five years after the transfer, the total was about $900,000 in different accounts. Almost a million. Almost a million. And I don't know, I do know that within the first 15 months, nothing came in until that except for $20,000 six months later. All right, so you say it was about $300,000 something, 15 months thereafter and then what was it the year after that? I'm not sure on the breakdown per year, Honor. I do not know that per year how much came in. I could find that out and provide that to the court. We'll read the record, that's all right. So the first point I'd like to make is with respect to Julian Jackson, the District Court and the Bankruptcy Court effectively gave Mr. Jackson 50% of the music rights of the case, including the termination and undoing the transfer. The problem with that was, first of all, Mr. Jackson in his pleadings in this case never challenged the validity of the notice letter that Mr. Glass sent him. In fact, if you read his answer, he doesn't even specifically deny, and I can provide the court later a record site specifically, but if you read Mr. Jackson's answer, he didn't even deny that particular statement that notice had been sent to him and that he didn't respond. More importantly, his claims were dismissed for lack of jurisdiction and upheld by this court. So for the District Court and Bankruptcy Court to award, to undo the notice that Mr. Glass gave him and to give Mr. Jackson 50% of the royalty interest was an error. If Mr. Jackson wants to pursue those claims in a different venue that does have jurisdiction, he's certainly welcome to do so, but it was improper. But he's no longer in this litigation? He's not, but he has been served with briefs throughout this because he was a party and he's not responded, not filed any briefs, not made any statement. Was he party to the litigation when the court awarded the 50% ownership? Or was he already out? No, he was, Your Honor. This is the second time this case has been up. The District Court awarded him damages, but that award was reversed for lack of jurisdiction. So because there's no jurisdiction, he didn't request it. Mrs. Katona didn't request it. In fact, in her pleadings, she admits that her and Raul were the only owners of these particular music rights. So nobody's requested that Jackson should get 50% and that part of it, at a minimum, should be reversed. Well, counsel, the only way to eliminate Jackson is to uphold your view, it seems to me, that he had not performed his obligations under the agreement. There's never been a court ruling accepting that, has there? I'm sorry, a court rule? Has there ever been a court who has ruled that Julian Jackson failed to uphold his obligations under the agreement, failed to provide the money? The only holding, it seems to me, is that he never got notice of Raul's claim that he needs to pay him a certain amount of money, including attorneys' fees of an unstated amount. So has there ever been a court ruling that Julian Jackson's interest has been forfeited? Is it just your argument that it has been? There has not been a court ruling, but nobody has requested that he get 50%. No party has requested that. He requested it, but his claim was dismissed for lack of jurisdiction. If he wants to contend that the termination was invalid, he has the means to do so. He can bring that claim in a proper court. That would be the answer to that. Well, but the ownership of record is that he has the 50%, and the only thing that would prevent that is if you are correct that that became forfeit, that was forfeit for failure to comply with his obligations. I don't see any way that a court could declare that you, your client, has the Julian Jackson interest without a finding that, in fact, he had forfeited it. Well, a transfer occurred, Your Honor, of all of the interest to Segundo Sueños. The only person who is asked to set aside is Ms. Katona, and she's not asked for Julian Jackson to get his portion back. Well, insofar as the record would show, though, that your client didn't have authority to do that. Well, I disagree, Your Honor. We believe the record does show, I mean, that he complied with his obligations. The only way he would have had authority is if, in fact, Julian Jackson had forfeited his interest, and there's not been a holding, finding to that effect. Well, that's correct, Your Honor. There has not been an affirmative holding, but we never — nobody ever brought a claim to the — nobody over whom the Court had jurisdiction brought a claim asking that that particular — that Julian Jackson's — the conveyance of Julian Jackson's interest be set aside. It occurred — if the district court wants to set aside the transfer with respect to Ms. Katona, she asked for it. There was jurisdiction, fine. But with respect to the transfer of any interest Jackson might have had, the Court didn't have jurisdiction. Mr. Jackson didn't have jurisdiction over Mr. Jackson's claim. So I don't think we needed to get a specific finding that that was terminated. Now, the Court — to address your question, Judge Southwood, we believe that the evidence actually was completely to the contrary. The evidence was that Mr. Gloss complied completely with the operating agreement. He sent the notice to the address it was required to go to. There was no evidence that they knew it was an incorrect address. The only evidence was is that they had attempted, but were unsuccessful, to serve Mr. Jackson in a separate lawsuit. And actually, the evidence was that they didn't know whether he received the notice at these other addresses and had to obtain service by publication because they weren't able to find him. The address was actually an office building, and we cited, I believe, to a website that shows it's an office building. So there would have been no reason for Mr. Gloss to know that he wouldn't have received notice there. But in prior proceedings, there was an — there was evidence by — from Jackson himself, I believe, that he didn't know how to reach your client, and that's why he had not updated his address information. What's the — what's your response to that? Well, they were actually in litigation at the time, so he could have reached — in that California litigation, the agreement had an address to which Mr. Gloss was to receive notice. So if Mr. Jackson wanted to give Mr. Gloss notice, he could have sent it to the address set forth in the agreement. Let me ask you a question about the fact that Mr. Gloss resigned his law license in 2002 after the felony conviction, but I think you're claiming that Segundo actually paid him $420,000 for services? No, Your Honor. He was never paid for services. Legal services? We're claiming that his services certainly brought value, and they weren't necessarily legal services. What were they for $420,000? Well, he was never paid that, Your Honor. He was only paid, I think, $48,000 for out-of-pocket expenses. We asserted that the damages assessed against my clients was incorrect because it put zero value to what Mr. Gloss had done. They weren't necessarily legal services. Even Ms. Katona's expert agreed that certainly he conferred great value on these music rights by exploiting them and doing a lot of work, and they agreed that that work, even though it wasn't legal work, it was worth up to $280 an hour. That was her own expert agreeing to that. And so that goes to the issue of the damages. Under the Uniform Fraudulent Transfer Act, the measure of damages is the value of the transfer. Everybody agrees that at the time of the transfer, this asset was essentially worthless. Ms. Katona's expert referred to it as a lottery ticket. The other expert testimony was without an earnings history, it's nominal, $10,000. Now, the Court did have the ability to adjust that under the equities, but there's the efforts of a good-faith purchaser, Segundo Sueños. There's no finding that Segundo or Alfred Gloss were not anything but good-faith purchasers. Ms. Katona has not challenged that in her brief. She's not disagreed with that. Furthermore, is the Bankruptcy Court, it said, I'm going to, in the District Court, they're going to adjust the value for the equities. They said the proper measure of damages ought to be to restore Ms. Katona to the position she would have been in had the transfer not occurred. In other words, had those assets remained within Artist Rights Foundation. Well, it's undisputed that her interest in Artist Rights Foundation was an economic or transferee, and she only had the right to share in profits, only profits, not gross proceeds, but profits. That's what would have happened. So it was incumbent upon Ms. Katona to put on evidence of what lost profits would have been. The cases we have cited under Texas law, evidence of gross receipts is not evidence of profit. The Bankruptcy Court and the District Court basically attempted to shift the burden upon the appellants to prove an offset, but that's not the proper way to do it. Texas law requires that you put on the proper measure of, evidence of the proper measure of damages. She didn't do that. By the way, even her own exhibits prove that the most all of the Galaz family and anybody involved received was $610,000 of the nearly million dollars that had been collected. That was her own evidence. If you counted all the money they received, it was only $610,000. So I submit that at the most, at the absolute most, it ought to be 25% of the number that she was claiming they had actually received. I would like to touch just in the last minute or so on the finding of actual fraud on the fraudulent transfer. I recognize the evidentiary burden that that is a clear error, but under Texas law, if the evidence establishes lack of intent, it can be decided as a matter of law. What is absolutely missing from the record is any evidence of any kind of motive on the part of Raul Galaz or Alfred Galaz or Segundo Sueños to commit any fraud. Because they had no idea, there was no evidence that they had any idea at the time of this transfer that those music rights were worth anything at all. There was zero evidence that they had any expectation that they would ever pay money. So there was simply no reason for them to conceal this or to fraudulently transfer. Well, if it was worthless, why transfer it? Because the reason was he needed somebody to invest to pay off the outstanding obligations, and actually I believe that the testimony says his intent was for Alfred to use it as a tax deduction because it would show that he purchased an asset and he could show that it righted off as a loss. Was that done? I do not know whether it was. I do know that the basis in Segundo Sueños' tax returns was the $10,000 that Segundo paid for the franchise taxes and the $10,000-some-odd paid in expenses. So the panel has no further questions on that. Yes, same time for rebuttal, Mr. Snell. Thank you. Mr. Lee? Good morning, Royal Lee, for Lisa Katona. May it please the Court. I want to start with whether there was a motive for fraud. Your question, Judge Southwick. This Court's opinions in fraud cases generally and fraudulent transfer cases specifically in the reported opinions in the Texas courts are filled with examples just like this one, where the fraudster comes in after finding a fact from the trial of court against the fraudster and says, but that's not what I intended to do. I intended to do something good and noble or at least wholesome. And the law is simply the Court knows this. It's embarrassing to tell you what you know. When the trier of fact finds against the fraudster and finds that there is fraud and, as in this case, when there are several of the statutory badges of fraud, this Court simply cannot disturb the trial court's finding. But the question is, what's the evidentiary basis for the finding? We review findings every day. And the basis, Your Honor, is there are at least six of the statutory badges of fraud. The transfer was to an insider. It was from Raul Galaz to his father. Segundo Sueños was simply a DBA for Raul Galaz on the day of the transfer. Raul Galaz didn't form Segundo Sueños for his father for another several months. So the transfer unquestionably is to an insider. It's undisputed that the transfer was concealed from Lisa. It was all of the assets of Artist Rights Foundation. Artist Rights didn't own anything other than the catalog of the music rights. Artist Rights Foundation was without dispute insolvent on the day of the transfer. Mr. Snell says they owed these taxes, and I agree with that. And they had no way to – Artist Rights Foundation had no way to pay them. It was, as a matter of law, insolvent. Well, but that then goes back to the motive, that Raul wanted those taxes paid, and the father was going to help on that, and the transfer therefore occurred. What about your – what's your response to that? Several parts, Judge. And this points in the direction of something you asked about, Judge Clement. It's the same music that has been popular for years. The songs have been playing for years. There's no evidence in the record, and I personally don't know what happened to the royalty payments or the revenue from all those times the songs played before sometime in 2005. The record doesn't tell us. But the songs were playing. Does the record tell us that? It does. It does not, Judge. Okay. I mean, the image you're creating is that there wasn't a sudden surge in popularity. There was a sudden ability to grab hold of the royalty. But the record is not there for that, correct? There's no evidence of where the revenue was. But I think it's a reasonable inference. I think it's the inference the courts below made that everyone knew the assets were valuable. The assets are the songs. The songs play. And when the songs play, there is corresponding royalty. The issue, the challenge was to capture the royalty. But I think it's an easy inference to say that everyone knew that the songs were valuable. And within months, within months, the money starts flowing. Who's managing the royalties now? I'm sorry? Who's managing the royalties now? Two things happen with the royalties now, Judge. This first point is important for several reasons. As far as I know, and I think as far as the record shows, there are two streams of payments. Some of the royalties are collected by an administrator called BMI. There is a judgment. This is referred to in the record. There's a judgment in the bankruptcy court, a judgment from which there was never an appeal. BMI interpleaded the funds that it was holding, paid those funds into the registry of the court, and agreed to a judgment under which it now continues automatically to pay its collections into the registry of the bankruptcy court. There is a bug music, or BMG music is the other administrator that also collects royalties. That stream is now impounded at bug and is not being paid. It's been sitting unpaid for actually before the litigation started. Is it still being collected? It is. And that may well be, this is speculation, Judge Southwick, that may well be the answer to those dollars may be the dollars from the earlier royalties. I don't know. And to be clear, that's complete speculation. But there is money there, and it's been there for years. As the bankruptcy court in any way, has anybody in the bankruptcy court in any way asserted a claim against that fund? Post-judgment on behalf of Ms. Katona, I have asked the district court to grant a turnover order and appoint a receiver to collect the funds that are, this is not in the record, but it's in the record of the district court. Okay. What's your position on whether the district court had jurisdiction to award 50 percent to Jackson? Jackson. Here's the second place where I think that interpleader judgment, the BMI judgment, is important. That judgment establishes that the money that comes in goes, is for Lisa Katona and Julian Jackson. That judgment awards relief actually to a court-appointed receiver for the benefit of Katona and Jackson according to their interests. No one ever appealed from that judgment. And I think it was that judgment that compelled the bankruptcy court to recommend to the district court. They couldn't ignore Jackson's interest in the funds because there's a judgment in the bankruptcy court from which no one ever appealed that says the funds as they come in are for the benefit of Katona and Jackson according to their interests. Well, in the first appeal back in 14, Julia Jackson, Julian appeared pro se. When does he drop out of the case? When does he no longer participate? This Court said in Galas 1 that there was no jurisdiction over his claims and this Court remanded. Right. And then the next event is the bankruptcy court's, it went back to the district court, Judge Hudspeth referred back down to Judge King and the next event was Judge King's proposed findings and conclusions in which Judge King proposed the 50 percent award to Jackson and Judge Hudspeth adopted those proposed findings and conclusions and entered his judgment. But Jackson was no longer a party to the case, no longer participating in the case as of that time? He had stopped. Maybe two distinctions there are a distinction in your question. Jackson had stopped participating even before that. Jackson didn't participate in any of the, even in the first appeal to, from the bankruptcy court to Judge Hudspeth. By then, Jackson had already stopped participating. When did Jackson cease to be a party? Well, this Court said in its first remand that there were no, there was no jurisdiction over Jackson's claims and no one challenged that. Nothing happened after that from, on behalf of Jackson. So should he be getting the 50 percent at this point? What's your client's position? I have two answers on that, Judge. She's asked you to affirm the judgment and so she asks you to affirm the judgment and the judgment includes that award for him. The, the, I understand the logic in the courts below for including it because of the other judgment, the one from which there has never been an appeal, the judgment in the BMI interpleader case in which the, all parties, well, it wasn't an agreed judgment, but the bankruptcy court said the money goes to Katona and Jackson. And so I understand why the courts below did what they did. There, there is a judgment that establishes Jackson's interest and from which no one ever challenged the judgment. Well, if Jackson wasn't entitled to the 50 percent, would your client be entitled to his 50 percent? No. No? Okay. Who would? That's the problem and I think that's the point Judge Southwick made earlier. It's not, I don't understand how the courts can simply divest someone of their property. I, that, I don't think property just, property rights just dissipate or go away. Perhaps they escheat under some State law and procedure for escheatment, but they don't just disappear into the air. Well, as I read the initial opinion which said the bankruptcy court had no jurisdiction, I did not read over the counterclaims by Jackson. I did not read that to mean that when this went back to the district court and to the extent the district court itself was involved in the proceedings that Julian Jackson could not file a counterclaim in that proceeding. But he never did and never further participated in any active way in the case. So we have somebody who maybe, I may not be reading the opinion correctly, could have participated on the remand, not in bankruptcy, but in the district court, did not do so. There's no judgment adjudicating anything as to him anymore, despite maybe the So we, what your opponent says is that they're entitled to it because they have a, you know, they have an assignment of all the interest out of whatever the acronym is, ARF or something like that. So I'm just troubled about what we can do with this non-party in this case. I find it quite questionable that we could declare Raul to have that money or Segundo to have that money or that interest, that interest. But we don't seem to have very many good possibilities here without Jackson being in this case. If the Court is going to give it to someone, give it to Ms. Katona. But I'm a lawyer and I'm supposed to say that. But frankly, I don't, I just don't see the lawful basis for the Court to, I mean, there's people in the audience. Can the Court simply divest them of their property? They're not parties in this case either. I just don't understand how a court does that. And Judge Southak, there is that underlying BMI interpleader judgment. And anyway, that is a judgment from which there was never any appeal. On the trial court's damage method, actual damages awarded to Ms. Katona, the reason that the courts below, the bankruptcy court first and then judge, the district judge gave for not deducting anything was because there is no deductible expenses would have been. Neither Raul Glas nor Segundo Sueños, I mean, this will come as no surprise from a convicted felon and a disbarred lawyer, neither of them ever kept anything like regular business records. They have no profit and loss statements. They simply have incomplete banking records. The expenses they suggested should be deducted were hundreds of thousands of dollars for Mr. Glas's supposed services. There are no time records. There's nothing like a contemporaneous time record. There are — they asked the district court to deduct expenses for completely unrelated litigation. They asked the courts below to deduct the expenses of their lawyers in this litigation. They asked the courts below to include expenses for payments that went to Raul Glas's mother, to Al Glas, to his girlfriend and to friends from prison. And it's simply a check register. That is the only evidence of anything like expenses, and none of them are legitimate business expenses. There are no — there are no records of any invoices, purchase orders. There's nothing like that. And the law on this is that it is their burden of proof to have, if they're going to claim deductible expenses, to have reliable, credible evidence of the — of those expenses. And there's nothing like that here. Judge King found and Judge Hudspeth adopted the finding that there is no credible evidence of any of that, and there is no challenge to that finding. Beyond that, in West v. Sue is a reported opinion. This is cited in the brief, and there's others like this. When the expenses to be deducted are actually payments to the fraudster, then the law is that you do not deduct the expenses, because deducting the expenses is really rewarding the fraudster for the fraud, for the misappropriation of the assets. The — What was the evidence? You say there's no legitimate evidence, but the district judge's final decision was to deduct some expenses based on the pre-assignment fraudulent transfer. Were there better records, or just not the pall of fraud hanging over poor records? For those expenses, Judge, there are pretty clear records. It's about $10,000. It might be $11,000. And those are the payments of the Artist Rights Foundation, the underlying company, the one from which the assets were stolen, of their franchise taxes. And those expenses are interesting because they were paid, I think, about a year after the transfer, and the dollars — this is undisputed — the dollars that were used to pay those franchise taxes about a year after the transfer were dollars that were then in the accounts of Segundo Sueños because of the payments that had come in on the musical rights. And so what happened was they used the stolen assets to pay those expenses. Judge King said, and Judge Hudspeth adopted the finding, that a whole other reason for not deducting any of the Segundo expenses was Lisa Katona was only responsible for the expenses that were associated with Artist Rights Foundation. She never had any responsibility for the expenses of the new company, Segundo Sueños. And there is no challenge to that conclusion. That's all I have for the Court. Thank you. Your Honor, I'd like to address the point that Mr. Lee said, that everybody knew that these music interests had great value because everybody knows the Ohio players. First of all, just because a song plays on the radio doesn't mean necessarily that Segundo Sueños or even Artist Rights Foundation would necessarily get that money. These are complicated assignments, and there's often litigation, a great deal of litigation, to determine who has ownership. So what can you tell us about the BMI interpleader judgment? Well, Your Honor, that's something that occurred after the judgment in this case. It's not at all — there's nothing in this record for this Court to look at to establish whether that would be collateral estoppel or res judicata. I mean, it's completely outside of the record. That was only adjudicated rights into certain funds that were being paid into the court registry. It didn't completely adjudicate all of the — who owned these musical interests. And so it's not before the Court. There's no record. We haven't had the opportunity to argue that before the district court and present argument and have the district court look into the facts of that. Was there a possibility of an inconsistent result? Let's say we were to agree with you if the interpleader judgment actually has different findings and that comes on up to us. Is there a potential inconsistency once that does come here? I don't believe so, because I believe this would establish ownership and it would be effectively law of the case. It's the same bankruptcy case. So maybe we shouldn't be deciding this case if, in fact, there's evidence in front of the bankruptcy court, district court, that resolves some of the issues that you raised with us. I may have a better handle on some of this than our current record does. With respect to Jackson's interest, here's what I would — you asked earlier, Judge Southwick, how we should handle that. Nobody's asking to divest Jackson of anything. What we're saying is it was improper for the court to rule on that issue when there was no jurisdiction over Jackson's claim. I think the answer is simply if the court were to affirm the judgment of the district court or bankruptcy court, just say the transfer is invalid as to Lisa's 25 percent and that's all that needs to be done. That restores Lisa. That makes her whole. And leave it at that. That's all that needs to be done. It's improper, I think, to adjudicate a claim of a person over whom the court has no jurisdiction. If Mr. Jackson would like to pursue those in a different forum that does have jurisdiction, that's fine. Let that forum take that up. There was just simply no evidence in the record at all that either Mr. Gloss, Raul, or Alfred had any idea that these royalties had any value at all. Thank you for your time. Yes, thank you, Mr. Snell. Your case is under submission.